PETER BAKER *vs.* HENRY L. TIBBETTS.

Worcester.    October 1, 1895. — October 17, 1895.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & BARKER, JJ.

*Personal Injuries — Evidence of Invitation to Place of Danger.*

While, in an action for personal injuries, there may be contradiction in regard to the question whether the defendant's agent invited the plaintiff to the place of danger immediately before the accident, yet, if there is direct evidence to warrant answering the question in the affirmative, a verdict for the plaintiff will not be disturbed.

TORT for personal injuries occasioned to the plaintiff, on September 19, 1892, by the explosion of gas in the " Motor Building," in Lowell.  At the trial in the Superior Court, before *Hopkins*, J., it appeared in evidence that on April 20, 1892, Warren Aldrich made a conveyance of various tracts of land including the " Motor Building," together with " all the fixed and movable machinery now in or about said building, including shafting, engines, and boilers, and all other articles fixed or movable now therein and connected therewith," to the defendant, as trustee for Aldrich.  At the time of these conveyances there were in the basement two large boilers in which were stored " bisulphide of carbon," two steam engines, one of which was a Fitchburg engine, shafting, and a pit lined with brick or cement, about eight feet deep and about eighteen or twenty feet square,

through and around which ran a large number of iron pipes
which were connected with the boilers, said boilers extending
from the bottom of the pit to several inches above the surface of
the floor of the basement, and forming a portion of one of the
sides of the pit.   There were also two condensers, one of which
was about eight feet square, and extended from the bottom of
the pit to a few inches above the surface of the floor of the
basement, and formed a part of one of the sides of· the pit.

The bisulphide of carbon in the boilers was drawn therefrom
by means of valves situated about a foot above the bottom of
the pit.

The plaintiffs introduced in evidence a lease of the " Motor
Building " from the defendant by his agent, one Stearns, to one
Sherman, and it was undisputed that Stearns rightly acted as
agent for the defendant in making this lease, which was dated
September 1, 1892, and was ratified by the defendant.

Sherman testified that, about the date on which the lease was
executed and afterwards, he learned that bisulphide of carbon
was stored in the boilers; that he was told by Stearns that it
was dangerous to have any fire near it, and not to allow any
smoking there ; that in the talk he had with Stearns about re-
moving the boilers, condensers, etc., it was settled that Stearns was
to remove all he wished him to remove ; that on September 19
Stearns was at work removing some of the machinery ; that he
noticed, several days before the accident, that the bisulphide of
carbon was leaking from the boiler ; that he said nothing to any
one about seeing the bisulphide leaking until after the accident
had occurred ; that he would not state that anything was done
in the way of moving the machinery from the Thursday prior
to the accident until the following Monday, when the accident
occurred ; that on the date of the accident the plaintiff and one
Ryan came into his office in the building in question to see him ;
that there was a staircase leading from his place down into the
basement ; that they started out of his office, went into the hall-
way and down the stairs into another hallway, and down another
short flight of stairs into the basement ; that there was a door
connecting the stairs with the basement below, and the door was
unlocked that morning ; that they went into the basement and
found a man who worked there by the name of Kelley, of whom

they inquired where Stearns was, and was informed that Stearns was outside in the yard; that they went out there and inquired of Stearns what part of the machinery he desired to leave in the basement, and Stearns said to them, " You come in and I will show you "; that thereupon all four went into the basement and along to the railing about the pit, and while standing on the condenser there was an explosion; that there was an agreement executed between Ryan and himself, on or before August 30, for a lease of the basement in question, to take effect on October 1 following; that at the time of making the agreement he informed Ryan that he could have the privilege of moving in any time before October 1, if the room was vacant and suitable to move into ; that Stearns had nothing to say about their going into the basement on September 19; that he understood that there would be danger from having gas arising from the bisulphide come in contact with fire; that he said nothing to Baker or Ryan about the danger that would be likely to result, because they were talking about other matters, and he did not think anything about it; that he did not know whether the key retained by Stearns was a skeleton key or not; that he also himself had a key to the basement, and thought the key was left with Stearns to keep Warren Aldrich, who was a feeble old gentleman, out of the basement, and to keep other people out; that Stearns did not want anybody there interfering in his proceedings and taking the machinery out; that on the morning when he came down into the basement he did not suppose that he was included among the number that Stearns did not want in there, because he supposed that he had a right in there, and he did not care anything about what Stearns said, as he supposed that he had a right in the basement, and it was in the exercise of that right and that authority which he understood he enjoyed that he went down there that morning, and it was in the exercise of that right and authority that he allowed Baker and Ryan to go there.

Ryan testified that he went to Lowell some time in August, 1892, on the occasion on which the agreement was executed between himself and Sherman; that on that occasion he saw Stearns in front of the building and afterwards inside; that they arrived in the building between nine and ten o'clock in the morning; that he first saw Sherman and Stearns ; that he met Sher-

man in the shop, and he mentioned that Stearns had something he wanted to leave in the pit there; that they went down stairs, through the door, and into the basement, and passed through the room out to the rear; that he thought Sherman spoke to some one working in the shop; that then they went out into the yard and saw Stearns there, who was working upon some pipes about twenty-five feet away; that they inquired of Stearns what he wanted to leave in the pit in the place, and he said some heavy pieces on account of the expense; that he was willing to floor it all over, and he would put them in one corner; that he said, "If you will come in, I will show you what I want left"; that he started in, and they followed over to the pit over the condenser, and while they were talking there was a flash; and that he went there again some time in October, and one Dobbins and his men were taking out the large condenser, and Stearns was helping move some pipes at the time, and heard Stearns give orders.

The plaintiff testified substantially as Ryan did with reference to what occurred on the date of the accident, and, further, that when he went into the building he had a lighted cigar in his mouth, but took it out and held it in his hand until he finished his business, and until the explosion occurred; and that he did not think that the cigar was lighted at that time.

Stearns testified that on the day of the accident there was bisulphide of carbon in the boilers, and that it had been there since 1885; that he saw Ryan and the plaintiff on September 19; that before the explosion he knew that the bisulphide of carbon, if mixed with air and a certain amount of heat, was dangerous, and if mixed with air would generate gas; that the liquid itself was not dangerous; that on the Saturday before the accident he thought he moved some iron from the basement, and on the Thursday before the accident he asked two men to go there and make arrangements to draw the bisulphide from the boilers; that he did not do anything about it himself, but was around there; that they quit on Thursday night after they had worked a part of the day, and that they drew one cask, or tank; that there was none spilled on the floor to his knowledge; that he did not look down in there; that he did what work was done on Saturday and Monday with the help of a man whom he em-

ployed; that at the time the accident occurred he was removing
the pony brake, and was at work in the room taking the pony
brake off the shaft when Sherman and Ryan came into the base-
ment; that when he went in that morning both inside doors
were locked; that Sherman had a key to the door; that he kept
a skeleton key that unlocked all the doors to the building; that
when he went into the basement that morning through the door,
he locked it after him because he did not want anybody else com-
ing in there while he was at work; that the door was locked
when Sherman came in with the other man, and Sherman un-
locked the door; that he did not make any agreement with
Sherman with reference to removing any of the articles in the
basement; that he had a talk with him, but made no agreement
whatever; that the agreement was made between Sherman and
another man, — not with himself; that he told Sherman before
the accident to keep fire away from the basement, and not to
smoke there or to allow any smoking, as he understood from what
he had been told that, if any fire came anywhere within range of
any gas, it would explode, and that he knew that a spark from
a cigar, if it came in contact with this gas, was liable to cause
an explosion; that he had no talk with Sherman about the
moving of the articles except when he first came to him before
August 30; that Sherman then asked him if the articles would
be removed if they got a chance to let the building, and he told
him whatever trade he made with Loren Aldrich, the son of
Warren Aldrich, would be carried out in full; that the trade
with reference to the removal of the property was, that they
should remove whatever Sherman needed taken out in case he
sublet the basement; that he did not have any other trade or
talk with Sherman; that he worked for Warren Aldrich, and that
he never worked for the defendant either as trustee or person-
ally at any time in his life; that the defendant knew nothing of
the material to be removed, and never did anything in the way
of assuming control over it, and that he, Stearns, made the ar-
rangement as to the men drawing off the bisulphide from the
boilers at the request and under the direction of Loren Aldrich;
that after Thursday evening there was nothing done until the
work that he did on the morning in the removal of the pony
brake; that he did not know anything about there being any

leak in the boilers down to the time or soon after the accident; that he did not know of any leak from the tank; that after the accident occurred he examined the tank to see whether any bisulphide that had been put into the tank had leaked out, and found that the tank was perfectly tight, and that none of the bisulphide sealed up by the parties had escaped; that Sherman never said anything to him about noticing any leak from the boilers, and on the morning of the accident he knew nothing about any leak from the boilers, and knew nothing of the existence of any gas in the pit; that after the accident he had nothing to do, directly or indirectly, with the removal of the bisulphide or machinery; that Dobbins and his men had charge of that, and the defendant did not have anything to do with it; that he was at work inside of the building, in the basement, when Sherman, Ryan, and the plaintiff came in; that he was not at work on the outside of the building, and had no work to do there; that he had a man there at work with him, one Kelley; that he did not observe any of them smoking when they came into the basement, and did not see either of them have a pipe or cigar; that he did not invite them, or either of them, to come into the building that morning; and that he did not speak to any of them in the back yard.

The defendant introduced in evidence a deed of the property from Warren Aldrich to the Marseilles Cotton Manufacturing Company, dated July 25, 1890, as evidence tending to show that the defendant Tibbetts did not have title to the property, and did not assume any control of it, but there was no evidence that the company ever took possession of the property or exercised any control over it; and also introduced as a witness Thomas Kelley, who testified that he was the Kelley who was at work in the basement assisting Stearns on the morning of the accident; that he saw Ryan, Sherman, and the plaintiff come down stairs into the basement; that Baker had a lighted cigar in his hand; that he saw the smoke as it issued from the end of it; that Stearns was inside in the basement when they came in, and was at work with him in the room; and that from the time when they came in until the explosion they did not go outside at all.

At the close of the evidence the defendant requested the judge to rule that there was no evidence tending to show any liability

on the part of the defendant, and to direct a verdict for the defendant.

The judge refused so to rule, and submitted the case to the jury, who returned a verdict for the plaintiff; and the defendant alleged exceptions.

*J. F. Corbett*, for the defendant.

*W. Thayer*, (*H. W. Cobb* with him,) for the plaintiff.

KNOWLTON, J. At a former hearing of this case it was held that there was evidence tending to charge the defendant with liability for the accident which happened to the plaintiff. *Baker* v. *Tibbetts*, 162 Mass. 468. At a second trial, before a jury, at which these exceptions were taken, there was evidence for the plaintiff upon each of the points referred to in the opinion of this court as grounds of recovery against the defendant. While there was much contradiction in regard to the question whether Stearns, the defendant's agent, invited the plaintiff to the place of danger immediately before the accident, there was direct evidence to warrant answering it in the affirmative. It was undisputed that Stearns rightly acted as agent for the defendant in making the lease, and there was evidence tending to show, on the grounds stated in our former opinion, that in a legal sense he represented the defendant in what he said and did in regard to the removal of the bisulphide of carbon.

The evidence of his conduct subsequently to the accident, as well as before it, taken in connection with his admitted authority to execute the lease, and with the evidence of ratification by the defendant, and with his denial that he made an agreement with Sherman to remove any articles from the basement, was competent as tending to show his relation to the business of removing the bisulphide of carbon.

*Exceptions overruled.*